The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GARLOCK *et al.*,

Plaintiffs,

v.

OPTIMISCORP,

Defendant.

Civil Action No. 3:22-cv-5108-BJR

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I. INTRODUCTION

Defendant OptimisCorp ("Optimis") holds a promissory note that is secured by liens on the personal residences of Patrick Garlock ("Garlock") and Michael Jennings ("Jennings") (collectively "Plaintiffs").[1] Plaintiffs filed this lawsuit seeking declaratory judgment that the promissory note is unenforceable because the applicable statute of limitations has expired, and to quiet title against the liens on their personal residences.[2] Optimis, who acquired the promissory note through a loan purchase agreement, filed counterclaims to enforce the note, for attorneys'

---

[1] Plaintiffs' wives, Larene Garlock and Nancy Jennings, are also plaintiffs in this lawsuit.
[2] Plaintiffs originally filed this case in Pierce County Superior Court; Optimis removed it to this Court in February 2022. Dkt. No. 1

fees under a fee-shifting provision in the note, for damages allegedly caused by Plaintiffs' breach of the loan purchase agreement, breach of the duty of good faith and fair dealing, and unjust enrichment. Currently before the Court is Plaintiffs' motion for summary judgment and Defendant's motion for partial summary judgment. Dkt. Nos. 38 & 43. Having reviewed the motions, the oppositions and replies thereto, the record of the case, and the relevant legal authority, the Court will grant Plaintiffs' motion and deny Defendant's motion.[3]

## II. BACKGROUND

Plaintiffs Garlock and Jennings owned MVP Physical Therapy ("MVP"), which operated multiple physical therapy clinics in Washington State. In 2007, MVP took out two loans that were evidenced by two promissory notes. The first note was for $805,000 and MVP was the designated borrower; the second note was for $930,000 and Garlock and Jennings were the designated borrowers. Both notes were secured by the same collateral: a commercial security agreement with publicly recorded UCC filings against MVP assets and deeds of trust against Plaintiffs' respective homes. Both loans required monthly payments that were paid by MVP. Plaintiffs contend that each loan was a business loan, and the proceeds were used entirely for MVP's benefit.[4]

---

[3] Defendant also moves to strike most of Plaintiffs' declarations filed in support of their motion for summary judgment. *See* Dkt. No. 49. Defendant argues that the declarations contain hearsay, parol evidence, and other inadmissible statements, arguing that Plaintiffs introduce this evidence to contradict "the unambiguous terms of the Loan Purchase Agreement and the Note." *Id*. at 10. Defendant particularly objects to Plaintiffs' statements with respect to the parties' intent surrounding the Loan Purchase Agreement. While the Court discusses Plaintiffs' allegations regarding the parties' intent in the Background section, *infra*, it does so merely to clearly frame the dispute between the parties. The Court does not rely on Plaintiffs' declarations in concluding that the Note is unenforceable and, therefore, does not need to resolve Defendants' motion to strike.

[4] Defendant disputes this and instead claims that the loan for which Garlock and Jennings were the designated borrowers was used to buy out their prior business partners and therefore benefitted them personally.

The two loans were refinanced through Heritage Bank ("Heritage" or "the Bank") in January 2008, with a maturity date of May 25, 2013. The first loan was payable in the principal amount of $774,828.33, and MVP was again the designated borrower. The second loan was payable in the principal amount of $918,720.45, and Plaintiffs remained the designated borrowers. Once again both loans were secured by a commercial security agreement with publicly recorded UCC filings against MVP assets, and deeds of trusts against Plaintiffs' respective homes. MVP continued to make the monthly payments on both loans.

In February 2008, Optimis purchased MVP and it became a wholly owned subsidiary of Optimis.[5] Optimis assumed control of MVP's business operations and Garlock and Jennings remained on as employees of MVP. According to Plaintiffs, "the plan was to build MVP's business and work toward a liquidation event in which MVP would be sold or shares would be sold through a public offering … [and Plaintiffs] would reap their reward with appreciated shares in Optimis." Dkt. No. 38 at 3-4. From March 2008 through December 2012, MVP, under the control of Optimis, made all monthly payments on both loans.

Both loans matured in May 2013 and the monthly payments on each loan became sporadic. Plaintiffs allege that this is because Optimis began experiencing financial difficulty due to litigation in which Optimis and its CEO, Alan Morelli, were the plaintiffs and former owners of another physical therapy business that Optimis acquired, Optimis' former directors, and Optimis' former CFO were defendants.[6] Optimis eventually obtained financing to pay off the loan on which MVP was the designated borrower, but the loan on which Plaintiffs were the designated

---

[5] Between 2007 and 2009, Optimis acquired nine physical therapy businesses, including MVP.
[6] *See OtpimisCorp v. Waite*, No. CV 8773-VCP, 2015 WL 5147038 (Del. Ch. Aug. 26, 2015) *aff'd* 137 A.3d 970 (Del. 2016)

3

borrowers remained unpaid with an outstanding balance of approximately $494,000.00 (hereinafter "the Note"). The Note is the subject of this lawsuit.

In July 2015, Heritage issued a Notice of Default on the Note and announced its intention to nonjudicially foreclose on the deeds of trust against Plaintiffs' homes. Plaintiffs allege that Optimis reassured the Bank that it intended to pay off the loan, initially representing that it would obtain financing to purchase the Note. Optimis was also in negotiations to sell MVP to another organization known as Benchmark. However, neither of these options panned out so, on August 17, 2015, Optimis and Heritage executed a loan purchase agreement through which the Bank agreed to sell the Note (and corresponding security) "As Is" to Optimis for $490,000 (hereinafter, "the Loan Purchase Agreement"). Plaintiffs signed a "Borrower Approval" through which they consented to the sale of the Note to Optimis.

This is where the parties' stories diverge significantly. Plaintiffs allege that it was understood by all involved that the Note was MVP's debt as evidenced by the fact that MVP, not Plaintiffs, had made the monthly payments on the loan since its inception, as well as the fact that the debt was secured by MVP's assets in addition to Plaintiffs' residences. Plaintiffs allege that Optimis agreed to purchase the Note from Heritage in order to stop the foreclosures on their homes. However, Plaintiffs claim that Optimis did not have the funding available to buy the Note from Heritage so Optimis' lawyer, Larry O'Shea, and accountant, Scott Schroeder, came up with a plan whereby Garlock and Jennings would transfer $225,000 and $414,008, respectively, from their 401(k) accounts into IRAs from which Optimis could use the funds to buy the Note. The funds in the IRAs were made available to Optimis through two means: (1) a capital infusion through purchase of Optimis Service Inc. ("OSI") stock and (2) loans to Optimis that were evidenced by convertible notes. Plaintiffs allege that Optimis ultimately collected $625,000 of

4

their 401(k) funds through this transfer, $490,000 of which was used to purchase the Note from Heritage. According to Plaintiffs, the terms of the parties' agreement were: (1) MVP would remain responsible for the debt evidenced by the Note after Optimis purchased it from Heritage, (2) Optimis would release the liens on Plaintiffs' homes, and (3) Optimis would repay the loans evidenced by the convertible notes within a year, thereby restoring Plaintiffs' retirement funds.

Optimis disagrees with Plaintiffs' description of its acquisition of the Note. Optimis claims that it never considered the Note MVP's debt, but instead, everyone understood that the Note was Plaintiffs' debt, as evidenced by the fact that the Note was secured by liens on Plaintiffs' homes in addition to MVP's assets. Optimis alleges that it agreed to purchase the Note from Heritage in order to help Plaintiffs and to release the Bank's security interest on MVP's assets. Optimis further alleges that it never agreed to release Plaintiffs from the debt, nor did it agree to release the liens on Plaintiffs' homes. Lastly, Optimis claims that it did not use Plaintiffs' 401(k) funds to purchase the Note; rather, Plaintiffs' use of those funds to purchase the OSI and convertible notes was meant to "show[] a greater commitment by [Garlock and Jennings] to Optimis." Dkt. No. 51 (Declaration of Alan Morelli) at ¶ 6.

While the parties disagree on the terms and funding of the purchase the Note, there is no dispute as to three key facts: (1) Optimis did not seek payment from Plaintiffs on the Note until it filed its counterclaims in this lawsuit; (2) this amounted to not seeking payment for nearly seven years; and (3) Optimis has not released the liens on Plaintiffs' homes. Plaintiffs also allege that Optimis never issued the convertible notes, nor repaid the loans that were secured by those notes. Plaintiffs instituted this action in March 2022, seeking a declaration that the Note is no longer enforceable because the applicable statute of limitations has expired and seeking to quiet title on the liens on their residences. Optimis counterclaimed, seeking to enforce the Note ($490,000 plus

another approximately $1.3 million in interest), among other relief. The parties' cross motions followed.

### III.    STANDARD OF REVIEW

The standard for summary judgment is familiar: "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)). A court's function on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there is not, summary judgment is warranted.

### IV.    DISCUSSION

As stated above, Plaintiffs move for summary judgment on their quiet title claim, arguing that the applicable statute of limitations governing the Note has expired. They also seek summary dismissal of each of Optimis' counterclaims. Optimis, in turn, seeks summary judgment on Plaintiffs' quiet title claim, and summary judgment on its counterclaims to enforce the Note, to recover attorneys' fees under the fee-shifting provision of the Note, and to recover damages it allegedly incurred as a result of Plaintiffs' breach of the Loan Purchase Agreement.

**A.    Plaintiffs Are Entitled to Quiet Title against the Deeds of Trust on Their Personal Residences**

An owner is entitled to quiet title if the statute of limitations has expired on the promissory note that is secured by a deed of trust on that property. *Cedar W. Owners Ass's v. Nationstar Mortg., LLC*, 434 P.3d 554, 559 (Wash. App. Ct.), *review denied* 441 P.3d 1200 (Wash. 2019); *see also* RCW 7.28.300 ("The record owner of real estate may maintain an action to quiet title

against the lien of a mortgage or deed of trust on the real estate where an action to foreclose such mortgage or deed of trust would be barred by the statute of limitations.") Here, Plaintiffs argue that they are entitled to quiet title against the deeds of trust on their personal residences because the applicable six-year statute of limitations to enforce the Note began to run on August 17, 2015, and expired on August 17, 2021. Optimis counters that the statute of limitations did not begin to run until August 17, 2021, and, therefore, has not expired. Alternatively, Optimis argues that if the statute of limitations did begin to run on August 17, 2015, Plaintiffs acknowledged the debt in 2018 and 2019, thereby restarting the six-year statute of limitations. Lastly, Optimis claims that Plaintiffs waived their right to avoid their obligation to satisfy the debt.[7] The Court addresses each argument below.

### 1. The Six-Year Statute of Limitations Began to Run on August 17, 2015

Under Washington law, promissory notes and deeds of trust are subject to a six-year statute of limitations that begins to run "after the cause of action has accrued." *Terhune v. North Cascade Trustee Services, Inc.*, 446 P.3d 683, 688 (Wn. App. 2019) quoting RCW 4.16.005. The parties agree that the applicable statute of limitations is six years; however, they disagree as to when the limitations period began to run. Plaintiffs contend that the six-year limitation period began to run on August 17, 2015, the date that Optimis purchased the Note and Plaintiffs signed the Borrower Approval form, and expired six years later on August 17, 2021, over seven months before Optimis filed its counterclaim demanding payment on the Note. Optimis counters that

---

[7] Defendant also argues that Plaintiffs have not shown that they are the record owners of their personal residences and, therefore, are not entitled to quiet title on the liens. Dkt. No. 49 at 12-13. This argument is readily dispensed with because Plaintiffs alleged in the Complaint that they own the residences and Defendant conceded the fact of ownership in its Answer. *See* Dkt. No. 1, Ex. 2 (Complaint) at ¶¶ 1 & 2; Dkt. No. 14 (Answer) at ¶¶ 1 & 2.

pursuant to *Barer v. Goldberg*, 582 P.2d 868, 871 (Wash. App. Ct. 1978) the six-year limitations period did not begin to run until August 17, 2021.

There are two types of promissory notes: installment and demand. An installment promissory note requires that periodic payments be made while a demand note "is payable immediately on the date of its execution." *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. App. Ct. 2014). Under Washington law, the six-year statute of limitation accrues on an installment note "for each monthly installment from the time it becomes due", *Terhune*, 446 P.3d at 688, while the statute of limitations "for demand loans begins to run on the date the loan is made." *Wallace v. Kuehner*, 46 P.3d 823, 829 (Wash. App. Ct. 2002). However, Washington courts recognize a limited exception—known as the *Barer* exception—to the general rule that the six-year limitations period begins to run on the date that a demand loan is made. These courts recognize that there is a small subset of demand loans in which the contracting parties specifically contemplate at the time of entering the loan that the loan would not be paid back right away. *Barer v. Goldberg*, 582 P.2d 868, 871 (Wash. App. Ct. 1978) (stating that the statute of limitations on a demand loan typically begins to run when the loan is made but "an exception to the rule exists when delay in making demand is contemplated by the parties at the time the contract is made and where speedy demand would violate the spirit of the contract"); *see also Cochran v. Cochran*, 233 P. 918, 920 (Wash. 1925) (stating that the general rule that the statute of limitations begins to run on the date that a demand loan is made does not "apply to a case where delay in making the demand is contemplated by the parties at the time the contract was made, and where a speedy demand would manifestly violate its intent"); *Nilson v. Castle Rock School Dist.*, 945 P.2d 765, 767 (Wash. Ct. App. 1997) (the *Barer* exception applied where "the circumstances surrounding the demand loan agreement reveal[ed] that the parties contemplated repayment

sometime in the future" because "[t]hey neither anticipated nor intended that there would be an immediate demand since the purpose of the agreement was to relieve the school of initially paying for the uniforms").

For this small subset of demand loans, Washington courts have concluded that it would subvert the parties' intent if the statute of limitations began to accrue on the date the loan was executed. Instead, for those demand loans were the parties expressly contemplated at the time that they entered the loan that payment would be delayed, Washington courts have determined that the limitations period does not begin to run until either actual demand is made, or if a demand is not made within six years of the loan's execution, then the six-year limitation period begins to accrue at the conclusion of six years. *Barer*, 582 P.2d at 871; *see also Wallace*, 46 P.3d at 828 ("Under *Barer*, the statute of limitations begins to run either (1) when an actual demand for payment is made, or (2) at the end of the statutory period noted in the statute of limitations. In other words, once a period of time equivalent to the statute of limitations period elapses without actual demand, a demand will be presumed, and the statute of limitations begins to run.").

Here, Optimis argues that the Note is a demand note and because Optimis did not demand payment within six years of purchasing the Note, under *Barer*, a demand must be presumed at the expiration of six years, and the statute of limitations began to run at that point. In other words, Optimis argues that the six-year limitation period did not begin to run until August 17, 2021. Optimis' argument fails for at least two reasons. First, the *Barer* exception only applies to demand notes. Here, there is no dispute that the Note between Plaintiffs and Heritage was an installment note and Optimis purchased the Note "As Is". Optimis seems to suggest that merely because it purchased the Note from Heritage, doing so somehow converted the Note from an installment note into a demand note. Optimis cites no authority for this proposition and the Court is likewise

unpersuaded by this argument. Second, it is not the failure of a creditor to demand payment on a demand loan within the relevant limitations period that triggers the *Barer* exception. Rather, the *Barer* exception only applies when the parties to the loan expressly contemplated at the time of entering the loan that payment would be delayed. There is nothing in the record to indicate that Plaintiffs and Optimis expressly "contemplated a delay in payment" or that "a speedy demand" for payment by Optimis would have "manifestly violate[d]" the purpose of the Note. *Cochran*, 233 P. at 920; *Hopper v. Hemphill*, 575 P.2d 746, 748 (Wash. App. Ct. 1978) (concluding that the statute of limitations began to run on the date of the demand loan because there was nothing in the record that suggested the parties intended otherwise when they entered their contract). Simply put, the *Barer* exception is inapplicable to this case. Thus, this Court concludes that the six-year statute of limitations began to run on August 17, 2015 (the dated that Optimis purchased the Note and Plaintiffs signed the Borrower Approval) and expired six years later on August 17, 2021.

### 2. Plaintiffs Did Not Acknowledge the Debt in 2018 or 2019

"The running of the statute of limitations is generally a bar to an action on an unpaid debt." *In re Tragopan Properties, LLC*, 263 P.3d 613, 614 (Wash. App. Ct. 2011). However, the limitations period may be renewed pursuant to RCW 4.16.280 if the debtor issues a written acknowledgment of the debt. *Id*.; *see also Jewell v. Long*, 876 P.2d 473, 474 (Wash. App. Ct. 1994) (same). To restart the limitations period, the debt acknowledgment must: (1) be in writing, (2) be communicated to the creditor, (3) recognize the existence of a debt, and (4) not indicate an intent not to pay. *In re Plastino*, 2020 WL 7753628, *5 (W.D. Wash. December 29, 2020) citing *Tragopan,* 263 P.3d at 616.

"Washington courts differentiate between acknowledgments written before and after the statutory period" has expired. *First American Title Ins. Co. v. Northwest Titled Co. LLC*, 2013

WL 4157656, *6 (W.D. Wash June 23, 2023). As applicable here, if the writing was made before the statutory period expired, to toll the statute of limitations, the writing must "expressly promise to pay the obligation, or acknowledge it as an existing debt." *Griffin v. Lear*, 212 P. 271, 275 (Wash. 1923). In addition, "[t]he acknowledgment must be so clear that a promise to pay must necessarily be implied." *Bank of Montreal v. Guse*, 98 P. 1127, 1129 (Wash. 1909), *see also Matson v. Weidenkopf*, 3 P.3d 805, 809 (Wash. App. Ct. 2000) ("When an acknowledgment is made before the running of the statute of limitations, we infer a promise to pay unless the writing expresses a contrary intention.").

Optimis claims that Plaintiffs acknowledged their obligation to repay the debt evidenced by the Note on four occasions: (1) Garlock deposition testimony dated February 28, 2018, (2) a July 3, 2018 email written by Jennings, (3) an April 3, 2019 email written by Garlock, and (4) a June 15, 2019 email written by Jennings. Each of these pre-dates the expiration of the six-year statute of limitations; thus, Optimis argues, they tolled the limitations period. The Court addresses each alleged acknowledgment below.

        **a.**      **Garlock's February 28, 2018 deposition testimony**

Optimis quotes a short excerpt from a 2018 deposition of Garlock that was taken in the litigation between Optimis and Morelli and the former owners of another physical therapy business, as well as Optimis' former directors and CFO. Optimis alleges that Garlock acknowledged the debt during this deposition. This argument carries no weight. The deposition testimony fails to satisfy the signed writing required by RCW 4.16.280. *In re Tragopan Properties*, 263 P.3d at 620 (holding that bankruptcy deposition testimony does not qualify as a written acknowledgment under RCW 4.16.280). Optimis concedes the same in its reply brief in support of its motion for summary judgment. Dkt. No. 54 at 13 fn. 5.

### b. Jennings' July 3, 2018 Email

Next, Optimis cites to a July 3, 2018 email that Jennings wrote to Paul Price, Optimis' lawyer at the time. The email, in its entirety states:

> Good morning, Paul-
>
> I have forwarded my correspondence with Kristy Willet at Heritage Bank. Apparently, there is a curtailment fee associated with the first note paid in 2013, I believe that needs paid to remove it from our reports. I will do this today.
>
> As to the second note, now held by Optimis, I would ask that its collateral be held by both Pat and my Optimis or OSI stock, exercised when there is a liquidity event and our homes removed as collateral. I think this makes the most sense and best represents the intention of our original agreements.
>
> Secondly, with respect to our outstanding convertible notes and your hesitancy to 'guarantee' fully funding both the principle and outstanding interest payments with monies received in the Lateral closing; I have serious concerns that other mouths needing be fed will dilute the opportunity for our retirement accounts to be made whole again. Because I am closer to retiring than not, I trust you can appreciate my expectation that within this closing that our hard earned retirement accounts be returned whole.
>
> Paul, thank-you for your consideration and attention to these important items.

Dkt. No. 44-10 at 2. The Court concludes that this email does not constitute a sufficient acknowledgment of debt for RCW 4.16.280 purposes. Again, as stated above, in order to satisfy RCW 4.16.280, the acknowledgment must either "expressly promise to pay or acknowledge that the obligation exists" and "[i]f the writing contains the latter, it must express a clear admission of the debt" and "not indicate an intention not to pay." *Fetty v. Wenger*, 36 P.3d 1123, 1125 (Wash. App. Ct. 2001); *see also Guse*, 98 P. at 1129 ("The acknowledgment must be so clear that a promise to pay must necessarily be implied"). The foregoing email does not contain an express promise to pay the debt evidenced by the Note. Thus, in order to satisfy RCW 4.16.280, the email must "express a clear admission of the debt." The email does not contain such an admission. At most, it references that Optimis holds some collateral with respect to "the second note" but this

reference in no way acknowledges that Optimis rightfully holds that collateral. This email is in sharp contrast to other writings that Washington courts have found to be sufficient to acknowledge a debt for purposes of RCW 4.16.280. *See e.g. Fetty*, 36 P.3d at 1126 (letter requesting an itemized bill for services and stating that recipient would be "paid for expenses and [] time spent" was a sufficient acknowledgment to toll the limitations period); *Griffin*, 212 P. at 274 (letter stating "I can only promise to pay the $1,600 with interest in some future time. You will never lose through me." constituted "a definite, distinct, and positive recognition" of debt, tolling the statute of limitations). Moreover, the email references Optimis' obligation to make Plaintiffs' retirement accounts "whole", thus contradicting any suggestion that Plaintiffs are in debt to Optimis. *Matson*, 3 P.3d at 809 ("When an acknowledgment is made before the running of the statute of limitations, we infer a promise to pay *unless the writing expresses a contrary intention*.") (emphasis added).

### c. Garlock's April 3, 2019 Email

Optimis also cites to an email that Garlock wrote to Optimis' attorney on April 3, 2019. The email states in relevant part:

> MVP is in your (OPTIMIS) hands now and frankly for the past many years. I had been a good steward during that rocky process and during my transition out of ownership since February of 2008. Upon my last day in 2017 I have been patiently waiting for the convertible note to be paid, and the Lien on my home to be released so that I can move forward. You and others at OPTIMIS have reassured me many times that capital was coming and that these items would be resolved. Also, as a shareholder I remain optimistic that a liquidation event is coming thus bring value to our shares. Do you have any updates on these items?

Dkt. No. 44-11 at 2. Nothing in this email suggests that Plaintiffs are in anyway obligated to pay the Note or implies a promise to pay. To the contrary, the email states that Optimis has a financial obligation to Plaintiffs that it has not yet performed. The April 3, 2019 email is not an acknowledgment of debt for purposes of RCW 4.16.280.

### d. Jennings' June 15, 2019 Email

Optimis cites to an email Jennings wrote on June 15, 2019 that Optimis claims "unequivocally indicates [Jennings'] intent to pay" the debt. The relevant part of the email states:

> 2) Mike and Pat old business. This August it will be 4 years that Optimis has held liens on our homes and defaulted on the 1 year convertible notes. Can this be resolved immediately. If collateral is what the board requires, both Pat and I agree using our nearly 450k of earned Optimis shares should suffice. As to the convertible notes (340k MJ, 150k PG), what is the path forward here to repayment of principle/interest?

Dkt. No. 45-2 at 2. In its motion, Optimis argues that Jennings acknowledged the debt Plaintiffs owed when he "offered, on behalf of himself and Garlock, the shares he and Garlock held in an effort to fulfill their obligations." Dkt. No. 43 at 17. Optimis cites to a Washington appellate decision in which a debtor secured a promissory note with a deed of trust on certain property, but later asked the creditor if he could secure the note by giving him a deed of trust on a different piece of property. The creditor agreed and the Appellate Court determined that the statute of limitations restarted at the time of the deed swap. *Jewell*, 876 P.2d at 474. In reaching its decision, the Appellate Court stated that "giving or substituting collateral security" can constitute an acknowledgment that restarts the statute of limitations. *Id*. *Jewell* is readily distinguishable from the instant case. First, unlike in the instant case, in *Jewell* there was no question that the debtor owed the obligation at the time that he swapped the deeds of trust. Second, in *Jewell* there was no ambiguity as to why the debtor offered the deed of trust. Here, on the other hand, Jennings references Optimis' default and again requests repayment thereby confusing the purpose of the email. The inclusion of the demand for repayment, by itself, rebuts any inference of a promise to pay. *See Guse*, 98 P. at 1129 ("The acknowledgment must be so clear that a promise to pay must necessarily be implied"); *Matson*, 3 P.3d at 809 ("When an acknowledgment is made before the running of the statute of limitations, we infer a promise to pay *unless the writing expresses a*

*contrary intention*.") (emphasis added). Thus, the Court concludes that the June 15, 2019 email was insufficient to restart the applicable six-year statute of limitations.

### 3. Whether Plaintiffs Waived Their Right to Avoid Their Obligation to Satisfy the Debt

Optimis argues that even if this Court determines that the Note is unenforceable because the statute of limitations has expired, Plaintiffs waived their right to assert that defense. In making this argument, Optimis relies on the Borrower Approval that Plaintiffs signed as part of the Loan Purchase Agreement between Optimis and Heritage Bank that states in relevant part: "Borrowers hereby acknowledge that they have no defense, …claim or demand of any kind …that can be asserted to reduce or eliminate all or any part of such borrower's liability to pay the note obligation." Dkt. 45-1 at 8. Optimis claims that the foregoing prohibits Plaintiffs from asserting the statute of limitations defense now.

Optimis is mistaken. The Borrower Approval is simply a representation regarding Plaintiffs' rights at the time that they signed the document on August 15, 2015; it did not waive prospective defenses. *Id*. ("Borrowers hereby acknowledge that they *have* no defense…") (emphasis added). As stated above, Plaintiffs concede that by signing the Borrower Approval, they acknowledged the debt, thereby restarting the statute of limitations. Thus, on August 15, 2015, they did not have a statute of limitations defense. However, the Borrower Approval did not waive any future defenses that may arise after the signing, such as the expiration of the limitations period six years later. What is more, under Washington law, "[a]n agreement to waive the statute of limitations … be for a definite time." *Taplett v. Khela*, 807 P.2d 885, 889 (Wash. App. Ct. 1991); *J.A. Campbell Co. v. Holsum Banking Co.*, 130 P.2d 333, 340 (Wash. 1942). Thus, even if the Borrower Approval purported to waive future defenses, it would be invalid under Washington law because it does not contain a time limitation.

For the foregoing reasons, the Court concludes that the applicable statute of limitation to enforce the Note is six years, the limitations period has expired, and Plaintiffs did not waive their right to assert the statute of limitations as a defense. Therefore, Plaintiffs are entitled to summary judgment on their quiet title claim and on Optimis' counterclaim to enforce the Note, for attorneys' fees under the fee-shifting provision of the Note, and for breach of the Loan Purchase Agreement.[8]

### B. Optimis' Remaining Counterclaims

Plaintiffs also move for summary judgment on Optimis' counterclaims for (1) breach of the duty of good faith and fair dealing, (2) unjust enrichment, and (3) breach of fiduciary duties.

#### 1. The Duty of Good Faith and Fair Dealing

Optimis alleges that Plaintiffs "violated the implied and statutory duties of good faith and fair dealing" when they "failed to satisfy the Note and instead brought suit against [Optimis] to quiet title to their properties in order to circumvent their obligations under the Note." Dkt. No. 14, Counterclaims at ¶¶ 77 and 80. Because this Court has already concluded that enforcement of the Note is barred by the statute of limitations and Plaintiffs are not barred from asserting such defense, Plaintiffs are entitled to summary judgment on this counterclaim.

#### 2. Unjust Enrichment

Optimis argues that Plaintiffs were enriched by its purchase of the Note and that the circumstances of the purchase make it unjust for Plaintiffs to retain that benefit. *Id*. at ¶¶ 86 and 91. A three-year statute of limitations applies to claims for unjust enrichment and begins to run when a party has the right to apply to the court for relief. *Eckert v. Skagit Corp*., 538 P.2d 1239,

---

[8] Because the Borrower Approval did not waive Plaintiffs' right to assert a statute of limitations defense to the Note, Optimis' counterclaim alleging that Plaintiffs breach the Loan Purchase Agreement by asserting said defense in this lawsuit also necessarily fails as a matter of law.

1240-41 (Wash. Ct. App. 1978). A party acquires the right to apply for relief when they can establish each element of the action. *Deegan v. Windermere Real Estate/Ctr.-Isle*, 391 P.3d 582, 591 (Wash. App. Ct. 2017). An unjust enrichment claim has three elements: "(1) the [Plaintiffs] receive[] a benefit, (2) the received benefit is at [Optimis'] expense, and (3) the circumstances make it unjust for [Plaintiffs] to retain the benefit with no payment." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). Thus, even assuming that the parties' agreement regarding Optimis' purchase of the Note is as Optimis alleges—*i.e.*, that the debt evidenced by the Note was Plaintiffs' debt, that Optimis acquired the Note with its own funds, and that Plaintiffs remained responsible for the debt after Optimis acquired it—each element of an unjust enrichment claim would be established, and the three-year limitations period on the claim began to run on August 17, 2015, the date that Optimis purchased the Note. Optimis filed its counterclaim for unjust enrichment on March 25, 2022, long after the limitations period expired. Plaintiffs are entitled to summary judgment on this counterclaim.

### 3. Fiduciary Duty

As stated above, in 2016, Optimis and its CEO, Alan Morelli, sued the former owners of a business it acquired, as well as several of Optimis' former directors and its former CFO. The lawsuit was in Delaware and sought damages and equitable relief for an alleged conspiracy that involved theories including breach of contract and breach of loyalty. *OptimisCorp v. Waite*, 2016 WL 2585871 (Del. April 25, 2016). The litigation was contentious, the trial court imposed sanctions on Optimis for witness tampering, and Optimis was largely unsuccessful in the lawsuit. Garlock and Jennings were not parties to the lawsuit but were witnesses, and Optimis retained counsel to represent them. With the breach of fiduciary duty counterclaim in this lawsuit, Optimis now alleges many of the same conspiracy claims against Plaintiffs that it alleged against the

defendants in *Waite*. For instance, Optimis alleges that Plaintiffs (1) were involved in a "scheme to take over Optimis", (2) that they "accepted money [in return] for voting in favor of [an] amendment to the Shareholder Agreement" that removed Morelli as CEO of Optimis, (3) that they "took steps to compete with MVP before they left MVP, including (a) encouraging MVP employees to leave for [a] competitor, (b) diverting patients to the competition, (c) failing to effectively run MVP, leading to the closure of MVP's most profitable clinic, (d) taking MVP equipment before leaving MVP, and (4) that they conspired with MVP's landlords to provide inflated proposed renewal lease rate MVP could not accept." Dkt. No. 49 at 26, fn. 11.

Optimis supports the foregoing allegations with a declaration from Alan Morelli in which he alleges that starting in 2012, Plaintiffs "were recruited to participate in a scheme to take control of Optimis" from him. Dkt. No. 51 at ¶ 8. He further alleges that he knows "all about [Plaintiffs'] involvement because they were interviewed and/or deposed in connection" with the Delaware lawsuit in February 2018 and the declaration attaches five exhibits that were exhibits to Garlock's deposition in February 2018. *Id.* at ¶¶ 8-9. In other words, Optimis concedes that it was aware of Plaintiffs' alleged participation in the alleged scheme to wrest control of Optimis from Morelli no later than February 2018. Optimis filed the fiduciary duty counterclaim in March 2022, over a year after the three-year statute of limitation for such claims expired. *Kazman v. Land Title Co.*, 2014 WL 128061, *6 (W.D. Wash. January 13, 2014) ("In Washington, the statute of limitations on a claim for breach of fiduciary duty is three years."); *In re American Intern. Group, Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009) ("For a breach of fiduciary duty or fraud claim, the statute of limitations is three years."). Thus, these claims are time-barred.

As for the remaining allegations, which Optimis groups together and labels "[Plaintiffs'] Involvement in the Scheme to Bankrupt MVP", Optimis relies on the following evidence: (1)

Nancy Jennings deposition testimony in which she states that her husband now operates his own physical therapy business called "MVP Physical Therapy"; (2) Morelli's declaration in which he: (a) accuses Garlock of working for a competitor, (b) accuses both Plaintiffs of "diverting MVP assets" to a competitor, and (c) accuses both Plaintiffs of stealing AstroTurf and treadmills (Dkt. No. 51 at ¶¶ 12-15); and (3) a July 7, 2019 email exchange between several Optimis managers (Dkt. No. 51, Ex. 6). The Court has reviewed the documents and concludes that they do not create a genuine issue of material fact as to whether Plaintiffs breached their fiduciary duties. As an initial matter, the fact that Jennings is currently working at another physical therapy office called "MVP Physical Therapy" in no way suggests that Plaintiffs attempted to sabotage MVP before they left the company. Likewise, the July 7, 2019 email exchange does not provide evidence for the same. While the authors gripe about Plaintiffs, they provide no evidence of actual wrongdoing. Instead, the email contradicts Optimis' allegations. Dkt. No. 51, Ex. 6 at 4 (suggesting that the lease was not renewed due to late payments rather than a scheme concocted by Plaintiffs ("Cristina was concerned that our late payment history would come back to get us and appears that it has in this case."); Ex. 6 at 2 (stating that employees' decisions to leave Optimis were "mostly centered around bonus payments, etc." as opposed to Plaintiffs luring them away to a competitor). Lastly, Morelli's declaration relating to the alleged "scheme to bankrupt MVP" is a series of self-serving statements that are not supported by evidence in the record and, as such, is insufficient to create a issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."). Thus, Plaintiffs are entitled to summary judgment on Optimis' breach of fiduciary duty counterclaim.

### C. Indemnity Agreement

In March 2023, Plaintiffs requested this Court's permission to file an amended complaint to include a request for declaratory judgment that an indemnity agreement they entered into with Optimis after the Loan Purchase Agreement was executed is unenforceable. Dkt. No. 29. The parties filed the instant motions before this Court resolved the motion to amend. Anticipating that the Court would allow the amendment, Plaintiffs also moved for summary judgment on the indemnity agreement claim; however, Defendant failed to respond to this argument. Therefore, the Court will allow additional briefing on this issue before resolving the claim.

## V. CONCLUSION

For the foregoing reasons, the Court HEREBY:

(1) GRANTS judgment pursuant to RCW 7.28.300 quieting title on Garlock's residence located at 3120 Soundview Dr. W, University Place, Washington and Jennings' residence located at 1732 Prospect Street, Tacoma, Washington;

(2) GRANTS summary judgment to Plaintiffs on all of Optimis' counterclaims;

(3) DENIES Defendants' motion for partial summary judgment; and

(4) ORDERS Defendant to file a responsive brief, limited to seven (7) pages, regarding the indemnity issue on or before October 13, 2023 and Plaintiffs to file a reply brief, limited to five (5) pages, on or before October 27, 2023.

Dated this 27th day of September 2023.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge